Good morning, I'm Judge Gould, I'm the presiding judge today and I'm glad to be sitting with Judge Cole who's visiting us and helping us with our workload and with Judge McGeehan. So without further ado we can get started in a few moments but for the NRDC we have Peter DiMarco, correct? Yes, your honor that's correct. And then on the other side of the case for the EPA we have Mr. Maxwell. That's right, your honor. And then we also have intervener counsel Amanda Berman. That's right, thank you, your honor. Well I just wanted to say all of us are on the bandwagon, very appreciative of the advocates appearing to help us especially in this pandemic. The case is only set for 15 minutes per side and I know that the respondents are dividing time between the EPA and Ms. Berman for her client. So if any party here today wants a little extra time to argue please just ask and it shall be given. So let's proceed with Mr. DiMarco. I'd like to reserve five minutes of my time for a lot later. May it please the court. TCVP is a neurotoxin and its widespread use on household pets presents severe risk to the health of young children. EPA appeared to agree with that statement back in 2016 when it concluded that ARTS' TCVP pet collars expose children to unacceptable levels of a pesticide that can cause learning disabilities, decreased intelligence, and other permanent harm to young children's development brains. But then the agency backtracked, said that it needed more information. During the Davis case it told this court that it needed a torsion step in order to respond to NRDC's petition. The agency waited years for that study and only ordered ARTS to perform it after NRDC sued. Once that study came in it confirmed what we had been telling the agency for over a decade that these products pose unacceptable risk to young children's brains. At that point the agency's peripheral was clear. Grant our petition. Initiate cancellation procedures. Remove these products from the market. But EPA bent over backwards to avoid the conclusions of the very study it had ordered ARTS to perform to reach those conclusions. If EPA was going to reject the conclusions of the torsion study after what it had told this court after delaying its response to our petition for years, it at least needed to provide a rational explanation for doing so and put that explanation in there. But it failed to do either of those things. EPA then compounded these errors by adopting a demonstrably false assumption that every pet owner using these collars would always remove at least one-fifth of the active ingredient when applying them to their pet's necks. EPA's children and for that reason its denial of our petition lacks substantial evidence. Your Honor, I'll begin by addressing the EPA's decision to replace a measurement from the torsion study with an illogical assumption that's contrary to the evidence. Mr. DeMarco, let me ask you about that. Why was it that maybe you're going to talk about this right now but why was it not reasonable for the EPA to assume that the composition of dust extruded from the TCP and TCVP collars is proportionate to the percentage of active TCVP present in the collar as a whole? So, Your Honor, the reason for that is that's contrary to how EPA and ARTS say that collars work. If I can start at how those collars work, they're made of plastic that's impregnated with the pesticide designed to release the active ingredient from that plastic collar onto the animal. The plastic in the collar is durable. It stays on the animal's neck for months until it's removed by pet owners. It's not dissolving or disintegrating onto the animal. So, yes, the liquid and the dust that are released from the collar onto the animal is going to have a higher concentration of TCVP than the collar itself, the collar as a whole. And what's more, Your Honor, shouldn't we defer, though, to the EPA's expertise? I mean, aren't we obligated to by law to defer to their expertise and experience on these matters of science in the court? The court is only obligated to defer to reasonable explanations offered on the record, Your Honor. And here, EPA's explanation is not on the record. It's a post hoc rationalization that appears only in this response brief. But more importantly, it's contradicted not only by that logical argument that I just set out, Your Honor, but also by the data from the study that the agency purported to rely on. So this transferability study or what EPA and ARTS refer to as the normal wear study, that shows that as these collars stay on the animal, the concentration of TCVP in those collars declines. So at the start of the study, the concentration was 14.6%, and after about three weeks, it was down to 7 or 8%. The only way that that concentration could go down is if the material leaving the collar had a higher concentration of TCVP than the collar itself. If it was the same as EPA assumed, that concentration would have stayed flat. But I guess, you mentioned the torsion study. Why shouldn't the EPA be allowed to abandon the torsion study liquid to dust ratio if other studies suggest the torsion study overestimated the amount of dust likely to release from the collar? The agency is absolutely permitted to do that, Your Honor, and that's not our position that it can. The problem here is, first, it needs to explain on the record that that's what it's doing, which it hasn't done. And second, the study that it purported to rely upon in that transferability study doesn't actually undermine the torsion studies, the liquid-dust ratio that it reported. The reasons for that, Your Honor, are... But I thought you were arguing, and so help me understand if you're not. I thought that you were arguing that the normal wear study, I guess you're referring to it as the transferability study, undermines the EPA's assumption that TCVP comprises just, I think, was 14.6%. Of dust from the collars. Can you help me understand? Can you explain that to me, please? Yes, Your Honor. That's our position. There is affirmative data in the transferability study that under... Or, sorry, over the normal wear study. I'll refer you back to that. There is affirmative data in the normal wear study that EPA did not address in its response brief, but certainly in its decision document, that show that that 14.6% assumption is wrong, that it underestimates the TCVP concentration in dust. Now, EPA points to other data in the normal wear study and claims that that conflicts with the torsion study. And there are several problems with that explanation, Your Honor. The first is that calculate the liquid-dust ratio. If you look at that study, it actually reports the concentration of TCVP in dust released from the collar. In trying to set that up against this normal wear study, which didn't calculate the liquid-dust ratio, didn't even mention it, and didn't determine whether the TCVP that was collected during that study was in liquid or solid form. Now, we can see that the agency is trying to bend the data from an unrelated study to answer questions that that study wasn't designed to answer by the fact that all of these calculations that EPA is relying upon to come up with this supposedly conflicting number, they appear only in the agency's response brief. Not in the study itself, not in the summary of that study by agency scientists, certainly not in the Petition Denial or 2020 Risk Assessment, which over the course of almost 100 pages mentions this normal wear study just once in a footnote, in a string cycle, without substantive discussion, and without any connection to the liquid-dust ratio. Now, Your Honors, our reply brief walks through step-by-step the specific flaws with the agency's calculations that it's offering in its response brief, but Your Honors do not need to do anything to see the flaw in the agency's reasoning. It's apparent on its face. EPA is saying that this normal wear study shows that just 4% of the TCVP, I'm sorry, 4% of the material released from the collars is made up of TCVP. But that normal wear study collected only a small fraction of the material released from those collars, just the stuff that was still on the collar after about one to three days, depending on how long the animal was wearing. But these collars are designed to continuously release the pesticide onto the animal, and none of that material was collected or analyzed. So this number that EPA is coming up with, it means that this type of post-hoc patently deficient calculations is not the type of explanation that this court grants deference to. I'll ask you about some of the assumptions that the EPA makes. Isn't it true that the EPA's risk assessment incorporates a number of highly conservative estimates and assumptions, and just try to figure out why isn't that enough to justify the outcomes of their ultimate risk assessment? Your Honor, this court in NanoSilver 1 said that the fact that EPA regards aspects of its risk assessment as conservative is legally irrelevant. Once the agency selects its rule of decision here, a level of concern of 1,000, the agency has to reasonably and rationally apply that rule of decision. So the fact that we aren't challenging some aspects of the agency's risk assessment doesn't mean that the agency gets a free pass on some of these important assumptions that it did err. Your Honor, the liquid dust ratio, which is the agency's central error, that's not an ancillary issue. EPA twice in its brief refers to this as the central issue for regulating TCVP collars. Had the agency not committed this error, it would have found that these products expose children to too much of this pesticide, and even considering the mitigation measures that HART's and EPA agreed to. Your Honor, another reason that EPA offers for rejecting the torsion study is that HART's told it that that study would come wrong, that it involved too much twisting, and that would generate an unreliable reading of the amount of TCVP in dust released from the collar. Well, HART's had been making this argument for years, and EPA was aware of it when it ordered HART's to perform the torsion study to determine the liquid dust ratio. And EPA was aware of this argument when it told this Court that the torsion study was the optimal method for determining the or even assuming that EPA was reasonable in discarding data from the torsion study that involved too much twisting. It doesn't explain why EPA discarded data from the torsion study that didn't involve that twisting, and which also shows that EPA underestimated the risk to kids. So the first step in the torsion study was to stretch the collars, activate them according to label instructions, and then that step released dust. It was wiped and sampled, and the TCVP content analyzed. And that measurement from the torsion study, taken without any of this extreme twisting that HART's and EPA object to, showed that TCVP collars released significantly more of their active ingredient as dust than the agency assumed it was crystal dust, four times as much dust as EPA assumed. And in the agency's sort of casting aside of the entire study, it doesn't explain why it ignored this conflicting data. Now, the agency also erred in assuming that pet owners would always remove at least 20% of the collar from their pet's neck. This assumption also is substantial evidence. So, EPA is a... If I can interject, Mr. DiMarco, I think we have some of these arguments down pretty clearly from your briefing. Initially, you said you wanted to save five minutes for a bubble. You're down to two minutes, and I would give you an extra three minutes so that you could have your vote five, because I think you're going to need to keep some powder dry to respond to the government and to HART's. But you might try to wrap up your current argument now. We'll keep that powder dry, Your Honor, yes. I'll just conclude by saying that EPA's denial of our petition lacks substantial evidence. It should be vacated and remanded to the agency with a response to our petition. Thank you, Mr. DiMarco. So, Aaron, if you mark on the clock for Mr. DiMarco, we'll give him just a full five minutes of planned rebuttal argument at the end. And then had Mr. Maxwell decided... I assume that the EPA is speaking first before the interview. That's correct, Your Honor. Mr. Maxwell, this was set for 10 minutes for your argument, five minutes for Ms. Borman. But just as I've given Mr. DiMarco some extra time, if you need it, I would give you a little. But why don't you proceed with your argument? Thank you. Good morning, Your Honors, and may it please the Court. I'm Gus Maxwell, United States Department of Justice, here today on behalf of the Environmental Protection Agency. In its 2020 risk assessment of PZVP pet products, EPA carefully followed its standard operating procedures for assessing pesticide exposure from treated animals to small children. The EPA's standards were stringent. No product that would cause exposure greater than 1,000 of the level expected to cause harm to small children was allowed to remain on the market. As a direct result of EPA's risk assessment, three PZVP products were removed from the market entirely, and the six flea collars that are at issue in this case were all subject to redesign or relabeling in order to meet EPA standards. Contrary to counsel's suggestion, EPA's protective assumptions overall are not irrelevant to this Court's review. This Court in Antisilver I said that EPA's high levels of risk protection were a point that was well taken in EPA's briefing, and only that they were irrelevant as a legal matter when a pesticide product fell on the wrong side of the agency's rule of decision. This Court should not sustain NRDC's attempt to second-guess EPA's risk assessment, which must be upheld under FIBRA, which is supported by the record on the whole substantial evidence. Mr. Rex, let me ask you some questions here. How should we view the EPA's decision to The physical form of the PZVP released from collars was the EPA's central focus in ordering The EPA has been consistent about this since we were able to get in this case at the mandamus stage. In our briefing there, the EPA said that the liquid dust composition of the physical form of the collar was the reason the Thornton study was needed. This is repeated in the decision document ER14 and in the agency's data evaluation record for the study itself, ER106. The not disregard or ignore Thornton study's finding, as Kelsey suggested, but implied that critical dust liquid ratio from the Thornton study to its risk assessment. Now the agency was also interested in the Thornton study's findings on the composition of the dust that was released from the PZVP collars in that testing. The data point there was useful to EPA, but it's not the only data point that was before the agency. After EPA ordered parts to conduct the Thornton study, parts also provided EPA with additional data from the normal wear study. Whereas the torsion study showed very high levels of PZVP release, the normal wear study showed only single digit levels of PZVP release. In the face of this highly exaggerated result and you thought using that result was still okay to incorporate extra protective measure. I'm trying to understand what that means in terms of your response here and whether you said that in your decision. The decision document did not incorporate the Thornton study's finding that PZVP was 97% of the dust that was released from the collars. Is that problematic? Not when considering the record on the wall. The two studies that are before the agency on an issue here showed vastly different levels of PZVP release. And in the face of this uncertainty, the agency reasonably pinned the content of the PZVP to a reliable paper, the amount of active ingredient in the collars as a whole. This is consistent with the agency's past practice. In the 2016 risk assessment, the agency employed the same assumption that active ingredient was 14.6% of dust released from the collars. That risk assessment didn't have the liquid to dust ratio of the Thornton study provided. So instead, I assumed punitive liquid to dust ratios 1%, 50%, 99%. In each case though, the dust was assumed to be 14.6% PZVP. The agency simply retained that default practice here in its 2020 risk assessment. Did the normal virus study that you referred to try to calculate the So I'm trying to understand why then that is relevant to your point that is part of your evidence to support your decision. The Thornton study provided two separate data points, both of which the agency was interested in, only one of which was the agency able to incorporate into its risk assessment. From the Thornton study, we learned that at most 0.38% of the mass of the Thornton study was that study's findings about the composition of the dust that was released. I'm having a little trouble with that, Mr. Maxwell, because I've been trying to reconcile or maybe you could help me. How do you explain the EPA's change in its view that the Thornton study would be the best means for determining the physical form of PZVP released from the TCD PET collars? Because that was reviewed in 2016. It was, and the agency did not depart from that view. The agency consistently said that finding the physical form, which is to say the liquid to dust ratio of the collars, was the point of the Thornton study. The issue of how much of the extruded dust is PZVP was a separate data point the agency could not incorporate into its 2020 risk assessment. Well, at what point then, I'd like to know if I can, at what point did the EPA decide that it was appropriate to credit, I guess, Hart's assertion that the Thornton study exaggerated Thornton and twisting unlikely overrepresented the amount of dust that's EPA's risk assessment where the agency said that it incorporated additional PET collars specific PZVP transferable residue and formulation studies that were submitted along with the Thornton study. This is the footnote that the Council for NRDC calls for the board's attention to. So that footnote, the string site, is what you're relying on. That's your substantial evidence? Yes, substantial evidence that before the agency is included in the studies that the agency had in front of it while it was conducting a risk assessment. Mr. Maxwell, could I interject a question please? So it seems to me that on the administrative law it's been long established that we have to review what the agency said and the reasons it came for its decision and I want to ask you to comment on that principle. If in fact the agency is making some arguments now which may be valid or may be challenged but if they're making arguments that they didn't include in their decision to deny cancellation, am I correct that we are not properly to consider those additional arguments? Certainly there's more information in our briefing and our arguments today than existed in EPA's decision document but the court must uphold a decision that even less than ideal clarity where the agency's path may be reasonably discerned. Here the inputs to EPA's risk assessment including the critical composition of the included in the table's appendix to EPA's decision document at ER 73 through 89. These are not newly minted since litigation began but have existed since EPA published its risk assessment. Mr. Maxwell, one more. I was just going to ask if we were to decide under a two-year argument that there's just too much being argued that wasn't in the decision document and we were to vacate and remand to the agency. How would it take for the agency to dot all of its I's, cross all of its T's and get all of its reasoning into a decision document? If the agency needed to issue a decision document that more clearly explained its reason, I could do so in 90 days' time. I just have a very quick question in terms of you know what evidence would support this argument that pet owners will show 20% of the pet collars and there is this earlier study done by parts on a different type of collar but it seems that this 20% figure is not scientifically based. It's just the agency thinks it's a conservative figure based upon a higher range in the earlier study. Quick response to that question if you would. Sure, the 20% cutoff rate that the agency employed was the lowest observed cutoff rate in a study conducted on a different flea collar. The study there applied flea collars to medium-sized dogs and the agency therefore used that 20% cutoff figure as a proxy to represent the typical pet owner's usage. Smaller animal owners would cut off more flea collars whereas large animal owners may not be able to cut off any extra flea collar material at all. However, because the exposure risks are so smaller for large dogs, while they'll have the agency's level of concern, increasing that application rate of available pesticide by 20% couldn't change the outcome of EPA's risk assessment. Okay, thank you. Well, let me ask you about that because I think you're referring to the efficacy study. Um, how is the pesticide used in that study that's I think it's Delamethrin similar to the TCP, TCVP and what was the length of the collars used in that efficacy study compared to TCVP and the torches? There is no record evidence of how the Delamethrin pesticide works as related to TCVP collars, nor does the record show how long the TCVP, I'm sorry, how long the Delamethrin collars were that were used in the efficacy study. I'll point out though that the TCVP collars range up to 27 inches that we're talking about here, which is a quite large dog net circumference. Um, the agency uses proxies throughout its risk assessment process to evaluate risk. Well, how should we reconcile, I guess, the fact that Parks advertises its collars as fitting dogs with necks up to 26 inches and the max, I think the maximum length of TCVP collars is 27 inches with the EPA's assumption that pet owners would disregard 20% of the TCVP collars. How do we reconcile that? So it's true that a dog with a 25-inch neck would have no leftover, would only have the two inches of leftover flea collar for adjustment that the labels call for, and there would be no extra material cut off from that dog's collar. But the agency's risk assessment presents the typical scenario, which represents a smaller pet owner as well as a larger pet owner. So the application of 20% rate here, which was derived from medium-sized dogs, is reasonable when considering the record on a whole. I can ask just one more question. Judge Gould, can I ask one more question? You can ask as many as you like, and the advocates get to keep arguing as long as we've got questions. Okay. You talked about EPA's 20% assumption, or I guess one of the issues is whether that was harmless. What's your best argument that that wasn't harmless? Our best argument that it's not harmless is... So if you look at the way this pesticide works, it's dispersed... It is harmless. It is harmless, if there was. I'm sorry, I think I've posited that. Okay. Go ahead. Certainly, and tell me if I'm not answering the question you're asking me. But the pesticide is dispersed across the animal's fur. So the larger the animal, the smaller the pesticide exposure that that animal causes. So when you have a large dog that has no flea collar cut off that's available to it because its net takes up the entire circumference of the flea collar, in that case, EPA has assessed exposure as well below half its level of concern. So even if you can't cut off extra pollen material, that additional 20% won't get close to reaching EPA's level of concern. I think, if I understand NRDC's argument, it's that they're arguing that this assumption, the 20% assumption, impacted the application rates of each collar. Is that... Did it or did it not, in your view? And isn't that an integral piece of the EPA's risk assessment? That's correct. The 20% cut off assumption was applied at the beginning of EPA's risk assessment process when it determined the application rate, the amount of variable pesticide that existed in each product. So the cut off assumption applied throughout these risk assessments. Okay. Thank you. Thank you, Judge Bowman. You're welcome. Mr. Maxwell, I think we want to leave a little time for Ms. Berman. So unless you need to make another point in 30 seconds, you're over your time. But as I said, you're entitled to that as your pandemic bonus. Thank you, Your Honor. Let me just amend one point that I made earlier. Should the court find for NRDC and permit to EPA with instructions other than simply to clarify the agency's risk assessment, the EPA would like nine months to consider the implications of the court's decision, which may require EPA to take further action that is more adverse to the administrator. I'll close by saying that the substantial evidence standard simply requires such relevant evidence to be present as would be a reasonable person to conclude that the agency's decision was correct, even if it is possible to draw two consistent conclusions from the record evidence. Here, EPA showed its work and substantial evidence standard requires nothing more. The court should deny NRDC's position and uphold EPA's risk assessment. Okay. Thank you, Mr. Maxwell. I will turn to Ms. Berman. Thank you, Your Honors. Amanda Berman on behalf of Intervenor, the Hearts Fountain Corporation. Your Honors, for decades, TCVP collars have been an effective and inexpensive way to protect pets from fleas and ticks and the diseases that they can carry. Their safety has been evaluated over and over, including most recently in EPA's 2020 risk assessment. From my client's perspective, that analysis was extremely conservative, if anything, overly conservative. EPA perpetually overestimated risk. For example, EPA set the one level of concern by applying three different sets of risk multipliers, one of those specifically to protect children. Hearts has worked with EPA to try to address NRDC's concerns. Hearts voluntarily canceled one collar and we redesigned and or relabeled the rest. But NRDC still wants EPA to cancel all of these collars and that would leave Your Honors many pet owners in the lurch, forced to choose among more expensive options that have to be applied more frequently. And I did want to highlight that because one thing that I think that's gotten lost in the briefing in our argument today is the benefits of these processes. Under FFRA, that's an essential part of EPA's analysis. And EPA recognizes those benefits at page ER32 of the record. Now, I'd just like to emphasize a couple of points on the two main issues that we've been on the torsion study in the way that NRDC now argues that EPA should have. NRDC argues that EPA should rely on the torsion study, not only to determine how much dust may be released from a TCVP collar when it is stressed, but how much of the dust is TCVP. And it points to statements from EPA suggesting that the torsion study might be relevant in both regards, statements from 2016. But there's a critical part of the story that's missing, Your Honors. And that is, after that, Parks explained to EPA that the torsion study that it was requesting would not accurately reflect what happens when an actual animal wears one of these collars over a period of time. And you can see that explanation, to give just one example, at FER145 in the record. And to put it very succinctly, what happens is because a torsion study requires extreme, 180-degree twisting, the chemical structure of the collar breaks down very quickly, and it releases much more TCVP than it would over regular use by an animal over time. And so that's why it's hard to provide an EPA not just with the torsion study, but also with the normal wear study, which showed how much of the dust released from a collar over the first several days of use on an animal, which is the period where the most TCVP you would expect to be released, it showed how much of that dust is actually TCVP. And what that study showed was that the percentage of TCVP in the dust released during the first three days of use was not 97%, as the torsion study showed, but 4% in the single digits. NRDC argues at one point in its reply brief in a footnote that it thinks that should be 8%. But either way, we're talking about 14.6% that it had used back in 2016, which is the percentage of active ingredient of TCVP in the overall collar, as yet another reasonable and conservative choice. And your honors, EPA did show it was doing that. And I would direct the court to the tables at pages 73 to 75, year 73 to 75, which show that 14.6% being used as the multiplier for the application rate. Ms. Berman, let me just ask you, because I thought Mr. Maxwell, in response to one of my questions, acknowledged that the normal wear study did not try to calculate the liquid dust ratio of the TCVP pet collars. Are you saying something different? No, your honor, but I think there's some confusion about this liquid dust phrase that I would love to clear up. So when you're talking about liquid TCVP to dust TCVP, and this becomes clear if you look at page ER65 of the record, where EPA explains that under a 2012 standard operating procedure, pet collar products are categorized as a liquid formulation. So while you and I would look at one of these collars, which look like strips of plastic and see a solid, EPA calls them a liquid. So when EPA refers, for example, as it does at record pages 56 through 58, year 56 to 58, it consistently refers to the liquid dust ratio for the collar. And so I think that's been adding in some confusion. Now, what the normal wear study showed, and the question it was designed by my client to try to answer, is when you get dust out of a collar, when it's being extruded during normal wear by an as opposed to the main other ingredient that would come out, which is called DCA. And it found that even during the first three days of use, the average amount of TCVP in the dust is very low. It's in the single digit percentages, nothing like what was shown in the torsion study, which simply, as we explained to you, does not reflect reality in that regard. And your honors, I would like to briefly address the cutoff, the collar cutoff issue as well. EPA relied on the efficacy study to incorporate the 20% collar cutoff. We think that was reasonable, including because that study showed 20% as the absolute bottom of the range of cutoff values in the study. Now, your honors asked about the differences between the collars. The ingredient is irrelevant from this perspective. The question is, we have functionally similar collars, plastic strips impregnated with a chemical. And the question is, when faced with a similar instruction, and we pointed to the label showing this, to cut off the collar up to leaving a certain amount of room at the end, what the study found was that anywhere from 20 to 43% is cutoff. So 20% was the very bottom end of that range. But your honors can also look at the petting study, which is another study submitted to EPA. And at HSDR 38, it shows that for the dogs in that study, which included small dogs and medium dogs, the average cutoff was 26%. So again, EPA used more conservative numbers. Now, for big dogs, EPA's margin of concern was consistently more than double the level of concern, more than 2000 in most cases, which means that it's less than half of the risk threshold. So even without doing the math, it's very clear that if you reduce or even eliminate the cutoff, it doesn't change the results. Ms. Berman, on the petting study, isn't it problematic that the EPA does not claim that it considered the study when developing the assumption? It seems like that might be an issue. Well, your honor, EPA pointed to the bigger study, the efficacy study, and we think it was reasonable to use that, the bottom of that range. If EPA didn't choose the middle, it didn't choose the high end. It looked at the uncertainty related to that study. None of these studies are perfect. None of them perfectly show what happens when an animal wears one of these collars over six to seven months. And it used it as a reasonable proxy. So we're just pointing to the petting study, and it's in the record. It's part of the record data as well. Again, the question is, is there substantial evidence supporting EPA's conclusion here? As Judge Gould said, the law seems pretty clear, but we have to rely on what's stated in the decision, not what's considered post hoc rationalizations. And I'll just try to reconcile that and understand what your position is. Thank you. Well, your honor, I would just like to add, and we showed in our brief at page 36, that even if you eliminate the collar cutoff entirely, it doesn't change the result. It doesn't bring any of the levels of the MOEs under the level of concern, even for large dogs, and especially for large dogs, because the product is getting distributed over so much more body surface. So I think the key point there is that there's actually a real problem as a result. NRDC doesn't argue that there's actually a change in the outcome, and that's critical. So if anything, your honors, if you think there was an error here, it's not an error. That actually changed the outcome. And therefore, the court should uphold EPA's analysis. Ms. Bergman, I have one question if I can interject. I was curious if there was a nation that you're aware of nationally involving hearts. And the reason I ask is that assuming that the EPA was making a mistake here, then there's going to be damage to an awful lot of young children. And one of the ways our system works is to provide remedies to damaged people. So that if there was a higher risk of this chemical hurting children, then everybody's recognizing. Now you would think somewhere in the country, someone would bring a lawsuit. Your honor, I'm not aware of any such lawsuit. To be clear, this is not a question I've asked my clients, so I can't promise there isn't one, but I'm not aware of any such lawsuit. And again, we would highlight that EPA's choices in this analysis were conservative at every single juncture. Sometimes more conservative than my client thought was appropriate. And so its result is also a very conservative result. And there are benefits from these products to families who are seeking to protect themselves and their children from the diseases that can be born by fleas and ticks. Thank you, Ms. Bergman. Thank you, your honor. Let me start, your honors, with the effort by EPA and Intervenor today to shift one of the fundamental terms of what this case has been about, which is saying that liquid-dust ratio is not the ratio of a liquid TCVP to dust TCVP, but rather it's just a ratio of liquid to dust generally. But EPA has long made clear that what it's interested in is the amount of TCVP in a physical form that is being released. That's why I ordered the HEARTS performance study. And that's indicated in the record that that was the purpose of the HEARTS direct the court's attention to some tables that are appended to the risk assessment as evidence that 14.6% assumption is in the record. If you take a look at those tables, so the first is table A2 ER73, that indicates that EPA started its risk assessment by applying percentage of TCVP in the collar, or 14.6%, and multiplied that by the weight of the collar to get the total amount of active ingredient. That's regardless of the liquid-dust ratio that the agency used, that's where it would have started its analysis, figure out how much TCVP total there is. And if you look at table E2, which is on ER86, that indicates that the agency plugged in the liquid-dust ratio into the tables to figure out the physical form of this total amount of active ingredient, how it was coming out. But that doesn't explain how the liquid-dust ratio was calculated. That is not the same as incorporating the 14.6% assumption, substituting out data from the torsion study. If EPA had used the liquid-dust ratio reported by the torsion study, it just wouldn't have plugged that ratio into this table in E2, it would have been exactly the same. So, the record indicates that time and time again, the agency said that it relied on the torsion study for the liquid-dust ratio. And the indications to the contrary, EPA said to the contrary, it was possibly just or not poured out by the record. Your Honors, I'd also like to address on remedy. Remedy is obviously a crucial issue in this matter. We've asked the court for a prompt deadline. We feel it's extremely important the court set a deadline for the agency to respond, given the severe risks to children and the agency's history of egregious delay, kicking the can down the road. Your Honors, the contention that the agency should get another nine months to analyze these questions is very, very troubling. We've urged the court to reject it. The agency, by all accounts, has had all the data that it needs to resolve this since at least December of 2019. And the agency did not oppose the 30-day deadline that we requested in our opening brief. Your Honors, I also think that EPA's indication that it would take significantly longer if it would have to revise the rationale rather than just write down what it's already put into its response brief points to another issue. Your Honors, if the court finds that the agency has only supported its decision by the post hoc rationalization, that obviously is not grounds for affirming the agency's decision. It has to be articulated by the agency. But Your Honors, we believe that the court also has discretion to evaluate the arguments that are now put before the court, because those are patently deficient and they lack substantial evidence. And if EPA were just to repeat those arguments on remand, Your Honors, we would be left with more delay and more litigation, more time that kids are left exposed to these unsafe chemicals. I want to make sure I understand what it is that you're arguing for right now. What are you requesting of the court in terms of the decision? Your Honors, most importantly, we're requesting a determination that EPA's rationale lacks substantial evidence and a deadline for the agency to revise its response on remand. In terms of the reasoning that the court offers, our preference and our request would be that the agency amend its response. Look, I was just going to say, make sure I've got the parameters of the issue on timing. If we were to accept your argument that the agency can't sustain its order based on reasons that weren't given and we were going to vacate remand, I understood you earlier say to give them 90 days and Mr. Maxwell says they would want nine months. Is that the spread? Your Honor, our request is a 30-day deadline, regardless of the rationale or the reasoning for the court's holding vacating the agency's decision. If I understood Mr. Maxwell correctly, he was requesting a 90-day deadline if the agency just needs to repeat the explanation that it's already offered in its response brief and a full nine months if the agency has to conduct a new analysis and our contention is that both of those deadlines are a new one. Let me ask you this question. If the agency's learned something today from hearing your argument or from hearing the argument by Garza's counsel and all of you have made very able arguments to the court, if the agency heard that and wanted to revise its rationale, is there any precedent that says they shouldn't be entitled to do that? No, Your Honor, the agency should revise its rationale and we don't contend that. Okay, thank you. I guess I just had one last question because Ms. Mervyn set out a number of reasons why we should uphold the EPA's decision because all the estimates were overly conservative and I'm not sure if I heard your response to that. Yes, Your Honor, so our first response is that, and I'm repeating a bit, Your Honor, is that NATO Silver One establishes that the fact that the agency regards some of those parameters that it uses in its risk assessment as conservative is legally irrelevant. The question is whether its decision is supported by substantial evidence and here the two errors that we've identified in the risk assessment related to the liquid dust ratio and related to the collar rule, both of those affected the agency's decision and led it to significantly underestimate the amount of pesticide that young children are exposed to. So the fact that other aspects of the agency's decision might have been reasonable, that doesn't cure the defect in those other areas. The uncertainty factors that the agency used, those are common agency practices. This is not extreme caution. It just reflects the fact that the only hard data we have about how PCBP hurts beings, hurts organisms, is based on a study on rats. And so to extrapolate from that outwards, common risk assessment science says that we need to apply uncertainty factors. Mr. DeMarco, I'm afraid you're three minutes over. You're already extended time and so I don't want to be like former Chief Justice Rehnquist on the Supreme Court and interrupt him and send some save time or something, but we need to bring the argument to a close. I greatly appreciate the additional time, Your Honors. All I would ask is that the court vacate the agency's petition and I will remain with the propped at home. Okay, thank you very much. Well, I just want to say I'm mad for the panel we've all appreciated the excellent advocacy from NRDC, from the EPA, and from HARTS. And this is an important case and a difficult one in some regards. So we will at this point submit the key. Unless Judge Muguiere or Judge Cole have a further question. We will now submit this case and the parties will hear from us in due course. Thank you. Thank you. Hello. This court for this session stands adjourned. Thank you so much, counsel. Judges, I'm moving out to your rubbing room.
judges: COLE, GOULD, MURGUIA